## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER MURTOFF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:21-CV-02607 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| MY EYE DOCTOR, LLC, and | ) | |
| CAPITAL VISION SERVICES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

A couple of years after she asked one of MyEyeDr.'s[1] optometry offices for a price quote on a pair of glasses, Jennifer Murtoff started getting automated phone calls from MyEyeDr., reminding her that she was due for an annual eye exam. R. 106-1, PSOF ¶ 19; R. 106-5, Murtoff Dep. at 123:18–124:1.[2] Frustrated by these repeated calls, she brought this proposed class action, alleging that MyEyeDr. violated the Telephone Consumer Protection Act (known in legal circles as the TCPA), 47 U.S.C. § 227 *et seq.*, by calling her without prior express written consent. R. 1, Compl. ¶ 1.[3] She seeks an injunction, $500 in statutory damages for each TCPA violation, and $1,500 in statutory damages for each willful TCPA violation. *Id.* at 9–10.

---

[1] The Defendant, Capital Vision Services, does business under the name "MyEyeDr." For ease and consistency, this opinion refers to the Defendant as MyEyeDr.

[2] Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

[3] Federal district courts have federal-question jurisdiction, 28 U.S.C. § 1331, for suits brought under the TCPA's private right of action. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

1

MyEyeDr. moves for partial summary judgment, arguing that the calls are health-care messages, thus exempting them from the TCPA's prior express written consent requirement. R. 91, Def.'s SJ Br. at 3. Murtoff, in turn, moves to certify her proposed class and subclass. R. 95, Pl.'s Mot. Class Cert. at 1. Because the Court concludes that a reasonable jury could readily find that the health-care exemption does not apply here, MyEyeDr.'s motion for partial summary judgment is denied. At the same time, however, the record evidence shows that Murtoff does not satisfy the predominance and typicality requirements for class actions, so her motion for class certification is denied.[4]

## I. Background

In 2018, while shopping around for a new pair of glasses, Jennifer Murtoff reached out to a MyEyeDr. optometry office in Illinois and asked for a price quote. PSOF ¶¶ 7–8; Murtoff Dep. at 97:23–100:16, 105:7–106.5. At the office's request, Murtoff emailed the office a copy of her glasses prescription. R. 111, Def.'s Resp. PSOF ¶ 8; Murtoff Dep. at 99:4–100:16. The prescription was from her optometrist, who is not associated with MyEyeDr. PSOF ¶ 5; Murtoff Dep. at 43:19–44:12, 105:7–9. A MyEyeDr. staff member then created a patient profile for Murtoff in the company's database and entered her prescription and personal information. PSOF ¶ 13; R. 106-3, Olney Dep. at 40:21–41:14. But Murtoff ended up not buying anything from MyEyeDr. PSOF ¶ 10; Murtoff Dep. at 122:21–123:2.

---

[4]Murtoff's claim against My Eye Dr. Optometrists, LLC, is dismissed with prejudice. Murtoff included this particular LLC entity in this suit by mistake and does not oppose dismissing the claim against this entity. R. 106, Pl.'s SJ Resp. at 1 n.1.

Fast forward: a couple years later, MyEyeDr. began calling Murtoff using a prerecorded message. Murtoff Dep. at 123:18–124:1. The message said that it was time for her next eye exam and told her to call MyEyeDr. to make an appointment. PSOF ¶ 20; R. 106-2, Taylor Decl. Exh. D. This was part of MyEyeDr.'s standard practice of sending these automated reminder messages to everyone for whom it has a telephone number and a "last exam date" in its patient-profile database. Olney Dep. at 114:2–21. After Murtoff received several of these calls, she brought this lawsuit. Compl. ¶ 1.

MyEyeDr. then moved to dismiss, contending that the calls conveyed health-care messages and thus did not require prior express consent under the TCPA. *Murtoff v. My Eye Doctor, LLC*, No. 1:21-CV-02607, 2022 WL 889004, at *1 (N.D. Ill. Mar. 26, 2022). This Court denied that motion, reasoning that based on the allegations in the complaint, MyEyeDr.'s automated messages plausibly fall outside the TCPA's health-care exception. *Id.* at *6.

But MyEyeDr. now renews its argument and moves for partial summary judgment, asserting that discovery has cemented that the company's reminder calls are health-care messages. Def.'s SJ Br. at 2, 8–9. Murtoff opposes that motion and moves for class certification. Pl.'s Mot. Class Cert. at 1. It is true that federal courts should usually decide class certification before turning to the merits to avoid the problem of "one-way intervention." *See Wiesmueller v. Kosobucki*, 513 F.3d 784, 787 (7th Cir. 2008). But when, as here, the defendant "moves for summary judgment in advance of" a decision on class certification, it "cannot complain about either the treatment of

the case as an individual action or the 'one-way intervention' that will result if the class should be certified at a later time." *Glidden v. Chromalloy Am. Corp.*, 808 F.2d 621, 625 (7th Cir. 1986). Thus, this opinion resolves both MyEyeDr.'s motion for partial summary and Murtoff's motion for class certification in one swoop.

## II. Summary Judgment

### A. Legal Standard

In deciding MyEyeDr.'s motion for partial summary judgment, the Court views the evidence in the light most favorable to Murtoff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d

451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## B. The Health Care Rule

The TCPA bans prerecorded telemarketing and advertising phone calls unless the call recipient has given prior express written consent. 47 C.F.R. § 64.1200(a)(2). But the Federal Communications Commission has issued an exemption from that requirement. Under the so-called "Health Care Rule," prior written consent is not required for calls that "deliver[] a 'health care' message made by, or on behalf of, a 'covered entity' or its 'business associate.'" *Id.* § 64.1200(a)(3)(v). And "health care" is in turn defined as "care, services, or supplies related to the health of an individual ... [including] [p]reventive, diagnostic, therapeutic, rehabilitative, maintenance, or palliative care, and counseling, service, assessment, or procedure with respect to the physical or mental condition, or functional status, of an individual ...." 45 C.F.R. § 160.103. The FCC modeled this Health Care Rule after the Federal Trade Commission's health-care exception to its Telemarketing Sales Rule and expressly adopted the FTC's approach to that rule. *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1853–54 (2012) (for convenience's sake, the "2012 FCC Order").

The FTC has provided some helpful guidance on the types of calls that fall within the exemption. Specifically, the agency has identified three categories of exempted prerecorded health-care calls:

- calls to describe a health-related product or service that is provided by, or included in a plan of benefits of, the covered entity making the communication;

- calls for treatment of the individual; and

- calls for case management or care coordination for the individual, or to direct or recommend alternative treatments, therapies, health care providers, or settings of care to the individual.

FTC, *Complying with the Telemarketing Sales Rule*, https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule#comply (last visited Sept. 23, 2024). In carving out these types of calls, the FCC reasoned that "the number of health care providers who might call a patient is inherently quite limited." 2012 FCC Order at 1853. Similarly, the FTC noted that the "the calls would come from a limited number of providers, and would be limited in their frequency by the medical needs of the patient." Telemarketing Sales Rule, 73 Fed. Reg. 51164, 51192 (Aug. 29, 2008). So these agencies wrote the exemptions narrowly, applying to a limited set of callers making a limited number of calls.

Indeed, the prefatory text leading up to the three categories explicitly describes the exemptions as applying "without a *patient*'s prior authorization," https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule#comply (emphasis added), thus confining the exemptions to calls for which the health-care entity already has a *patient* relationship with the call recipient. If the

rule were interpreted otherwise, the exemptions would undermine the TCPA itself, allowing health-related entities to indiscriminately conduct wide-scale automated calling campaigns, trying to recruit new patients and sell them services. That would open the door to the very problems that the FTC and FCC were trying to regulate in the first place.

As noted in this Court's opinion on the motion to dismiss, the district court in *Zani v. Rite Aid Headquarters Corp.*, 246 F. Supp. 3d 835 (S.D.N.Y. 2017), helpfully distilled the Health Care Rule's text and agencies' guidance into a three-factor test. *See Murtoff*, 2022 WL 889004, at *3. Again, the Court adopts that test and applies it here. The factors are: (1) whether the call "concerns a product or service that is inarguably health-related"; (2) whether it "was made by or on behalf of a health care provider to a patient with whom she has an established health care treatment relationship"; and (3) whether the call "concerns the individual health care needs of the patient recipient." 246 F. Supp. 3d at 851. MyEyeDr. argues that satisfying just one of these three factors is enough to qualify for the Health Care Rule. Def's SJ Br. at 8. Not so. Each factor reflects a different aspect of the Rule's text and of agencies' guidance. So all three factors matter, and the Court must balance them together in evaluating whether MyEyeDr.'s calls are health-care messages.

### C. MyEyeDr.'s Calls Fall Outside the Exemption

MyEyeDr.'s calls to Murtoff satisfy factor one but fall so far short on factors two and three that, on balance, the calls do not qualify for the health-care exemption. First, as MyEyeDr. correctly asserts, its calls are "inarguably health-related." Def.'s

SJ Br. at 9. The calls were reminders for Murtoff to schedule an annual eye exam. PSOF ¶ 19; Murtoff Dep. at 123:18–124:1. Annual eye exams provide diagnostic and preventative care for eye health. So, yes, the calls were health-related.

Second, MyEyeDr. asserts that it had an established a health-care treatment relationship with Murtoff when it called her. It says that by reaching out to a MyEyeDr. optometry office and sending it her HIPAA-protected personal health information, Murtoff became a MyEyeDr. patient. Def.'s SJ Br. at 10. Murtoff counters that because she never received any services or bought any goods from MyEyeDr., no health-care treatment relationship was formed. Pl.'s SJ Resp. at 10. Though both are valid arguments, Murtoff's has the better of the argument and, at the very least, a reasonably jury could find no treatment relationship on the facts presented here.

Although Murtoff had some contact with MyEyeDr. before it started sending her reminder messages, a reasonable jury could readily find that the contact was not enough to create a treatment relationship. When she was looking for new glasses, Murtoff asked for quotes from several optometry offices. MyEyeDr.'s office was just one of the places she contacted. Murtoff Dep. at 116:1–117:8. Then, at the office's request, she emailed over her prescription and some personal details, including her vision-insurance plan information and cellphone number. Def.'s Resp. PSOF ¶ 8; Murtoff Dep. at 99:4–100:16. After this, she had a follow-up call with a MyEyeDr. employee to discuss some questions that Murtoff had asked in her email, such as the price range of frames available and how long it would take to make the glasses. Murtoff Dep. at 100:2–16, 108:1–10. That was the full extent of the relationship

between Murtoff and MyEyeDr. She did not move forward with buying anything from MyEyeDr., and the company never provided her with any actual eye care or treatment. PSOF ¶ 10; Murtoff Dep. at 122:21–123:2.

Yet MyEyeDr. says that was enough to create a treatment relationship because Murtoff sent the company HIPAA-protected medical information (her prescription). Def's SJ Br. at 10–11. That alone is not enough to establish, as a matter of law in all similar circumstances, a treatment relationship. Remember that when issuing the health-care exemption, the FCC and FTC reasoned that "the number of health care providers who might call a patient is inherently quite limited," and the number of calls "would be limited in their frequency by the medical needs of the patient." 2012 FCC Order at 1853; Telemarketing Sales Rule, 73 Fed. Reg. at 51192. MyEyeDr.'s interpretation of the Rule would run counter to that guidance. On MyEyeDr.'s approach, every health care provider that an individual reaches out to and shares some medical information with could then flood the person in perpetuity with health-related reminder calls. For example, if someone were searching for a new dentist, contacted 10 offices to ask about pricing, and shared some dental records with all of them at their request, then the would-be patient could then be subject to (absent affirmative withdrawal of consent) 10 calls every six months with semiannual cleaning reminders. The same goes here. Murtoff contacted and shared her prescription information with several other optometry offices and eyeglasses stores. Murtoff Dep. at 116:1–117:8. By MyEyeDr.'s logic, she may have formed a treatment relationship with all of these places, allowing them to call with eye-exam reminders. That

9

undermines the FCC and FTC's guidance that only a "limited" number of calls from a "quite limited" number of providers can call consumers under the exemption.

MyEyeDr.'s definition of a treatment relationship also conflicts with what other courts have said. For example, in *Zani*, the court concluded that the defendant's flu-shot reminder calls were "made within the confines of an established health care treatment relationship" because they were "sent only to patients … who had previously filled prescriptions at [the defendant's] pharmacies." *Zani*, 246 F.Supp.3d at 852, 855. Similarly, in *Bailey v. CVS Pharmacy, Inc.*, No. 17-cv-11482, 2018 WL 3866701 (D.N.J. Aug. 14, 2018), the court concluded that the defendant's messages about flu-shot availability qualified for the health-care exemption because they went only to current customers who were awaiting prescription pickup at the defendant's pharmacies. *Id.* at *1, 6; *see also Jackson v. Safeway, Inc.*, No. 15-cv-04419-JSC, 2016 WL 5907917, at *1 (N.D. Cal. Oct. 11, 2016) (explaining that the defendant's flu-shot reminder calls qualified for the exemption in part because the plaintiff had gotten a flu shot at the defendant's pharmacy before). The throughline in these cases is that to have an established treatment relationship under the Health Care Rule, the defendant must have previously provided the plaintiff with some health-care service, care, treatment, or product. MyEyeDr. does not meet that requirement. True, it took on the duty of protecting Murtoff's prescription information in compliance with HIPAA. But that was not enough create a treatment relationship with her (or, at the least, a reasonably jury could so find). The second factor weighs in favor of Murtoff.

On the third factor (whether the calls addressed the plaintiff's individualized health care needs), although the calls took into account Murtoff's then-most-recent eye-exam date, MyEyeDr.'s reminder calls were not sufficiently tailored to her individual health needs (again, at the very least, a reasonable jury could so find). MyEyeDr. explains that optometrists recommend that patients receive an annual eye exam, so the company sends reminder calls shortly before "the anniversary of each patient's prior exam or prescription expiration." Def.'s SJ Br. at 11–12. And MyEyeDr. says that its calls were tailored to Murtoff's needs because her patient profile showed that it had been more than a year since her exam. *Id*. This does reflect some individual tailoring, but again, a reasonably jury could reject its sufficiency for the exemption.

For starters, MyEyeDr.'s calls contained a generic, prerecorded message that said, "According to our records, it's time for your next eye exam," and encouraged the recipient to schedule an appointment. PSOF ¶ 20; Taylor Decl. Exh. D. The only content difference among the thousands of these calls that MyEyeDr. sent to people across the country was the office callback number provided in the message, which was the number of the MyEyeDr. location associated with the recipient. Olney Dep. at 100:22–104:5, 105:9–23.

Plus, when she started getting MyEyeDr.'s calls, Murtoff had been seeing her optometrist (who is not associated with MyEyeDr.) for over a decade; she had already received annual eye exam reminders from his office; and she had not suggested in any way that she wanted to switch providers. Murtoff Dep. at 43:19–45:5, 58:9–21,

81:2–90:19. Importantly, because Murtoff had never had an eye exam with MyEyeDr., the company did not have a complete picture of her eye health and could not fully tailor its reminder calls to match her individual needs. Instead, it based the timing of its calls solely on the eye-exam date on the prescription that she had emailed. Olney Dep. at 122:10–24. That would not, for instance, account for eye exams that Murtoff got *after* sending her prescription to MyEyeDr. Finally, due to a data entry error, the eye-exam date that MyEyeDr. put in Murtoff's patient profile was not even the correct date listed on her prescription. R. 106-4, Pitts Dep. at 37:24–38:19. MyEyeDr.'s calls thus did not conclusively address Murtoff's individual health needs.

Again, caselaw supports this point. In *Zani*, the "calls … alerted … patients to the availability of a medication treating the precise medical issue for which they had previously sought care" from the defendant. 246 F. Supp. 3d at 852. Here, in contrast, MyEyeDr. sent Murtoff reminder calls even though she had never received or sought an eye exam from the company. In *Jackson*, the defendant limited its calls to existing patients who "had not yet received a flu shot during the current flu season." 2016 WL 5907917, at *2. Here, in contrast, MyEyeDr. called Murtoff despite her not being an existing patient and despite the company not having accurate or complete records on whether she truly needed an eye exam. MyEyeDr.'s calls thus fall short of the individual tailoring that other courts have found sufficient to qualify for the Health Care Rule. A reasonable jury could find that the calls fail factor three.

In sum, based on an evaluation of the three *Zani* factors, and viewing the evidence in the light most favorable to Murtoff, a reasonably jury could easily find that MyEyeDr.'s reminder calls do not constitute health-care messages exempt from the TCPA's prior express written consent requirement. The Court thus denies MyEyeDr.'s motion for partial summary judgment. Indeed, if Murtoff had filed a cross-motion for summary judgment, it is possible that the Court would have entered partial summary judgment in her favor on this issue. But without a cross-motion, it is not 100% clear that MyEyeDr. mustered all of its arguments, both legal and factual, to resist the conclusion that—as a matter of law—the calls were *not* entitled to the exemption. Having said that, the Court is skeptical that a reasonable jury could find for the defense on this issue, even if the inferences were flipped in the defense's favor. This point will be the subject of discussion in the pretrial-motion stage (if the case advances to trial).

### III. Class Certification

### A. Legal Standard

To be certified, a class must meet the requirements of Federal Rule of Civil Procedure 23. *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993). Under Rule 23(a), the class must meet the requirements of numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). Additionally, it must satisfy at least one of the conditions of Rule 23(b). Fed. R. Civ. P. 23(b); *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008). In this case, because Murtoff seeks money damages, the relevant Rule 23(b) requirement is that "the questions of law or fact common to class members"

must "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"A class may be certified only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 916 (7th Cir. 2011) (cleaned up).[5] The named plaintiff bears the burden of showing by a preponderance of the evidence that all of Rule 23's requirements are satisfied. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). The Court "must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010) (cleaned up); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (recognizing that class-certification analysis "[f]requently … will entail some overlap with the merits of the plaintiff's underlying claim"). In the end, the Court has "broad discretion to determine whether certification of a class-action lawsuit is appropriate." *Ervin v. OS Rest. Servs., Inc.*, 632 F.3d 971, 976 (7th Cir. 2011) (cleaned up).

### B. Individual Record Review Would Be Required

Murtoff seeks to certify the following class under Federal Rule 23(b)(3):

All persons within the United States (1) to whom Defendant [MyEyeDr.], via its vendor 4PatientCare, placed one or more "recall" calls during the Class

---

[5]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

Period, (2) to said person's cellular telephone, (3) within the four years prior to the filing of the Complaint, (4) whose Acuity "patient profile" within [MyEyeDr.'s] records reflects no appointments, orders[,] or transactions.

Pl.'s Mot. Class Cert. at 1. She also seeks to certify a subclass (the "Outside Doctor Subclass") comprising members of the Class for whom the "associated prescriptions" in MyEyeDr.'s records "are from an 'outside doctor'" (that is, an optometrist not affiliated with MyEyeDr.). *Id.*

In response, MyEyeDr. argues that the Class and Outside Doctor Subclass should not be certified because manual, individualized review of each proposed class member's records in MyEyeDr.'s database would be required to determine if calls to that member fall within the Health Care Rule. R. 102, Def.'s Resp. Class Cert. at 6–7. MyEyeDr. explains that individual review would be necessary because: (1) many of MyEyeDr.'s patients are from optometry practices that the company acquired, and those patients' pre-acquisition health-care records are not integrated into MyEyeDr.'s database; (2) some patients have duplicate patient profiles in the database; and (3) patient profiles have notes fields that are not searchable. *Id.* at 8. Thus, conducting an automated search on MyEyeDr.'s database, as Murtoff proposes, would not accurately reveal the treatment interactions between proposed class members and MyEyeDr.

Murtoff's main response is that the treatment relationship between a patient and the patient's optometrist's practice terminates when the practice is acquired by another entity. R. 112, Pl.'s Class Cert. Reply at 1–2. So, she says, for patients from practices that MyEyeDr. acquired, pre-acquisition health-care records are irrelevant

in determining whether MyEyeDr. has a treatment relationship with them. *Id.* That would eliminate the need for individual review of records that have not been integrated into MyEyeDr.'s database. She also argues that any issues with duplicate patient profiles can be resolved through basic data filtering. *Id.* at 7–8. And she asserts that being unable to search notes fields is not an issue because they contain only redundant information. *Id.*

MyEyeDr.'s arguments and evidence carry the day here. To support its position that individual, manual review would be required, MyEyeDr. cites an expert report by Ken Sponsler. Sponsler took a random sample of almost 400 of Murtoff's proposed class members and then collected and conducted a manual review of those patients' health-care records, which included MyEyeDr.'s database entries, pre-acquisition patient records, and notes fields. R. 102-6, Exh. 1, Sponsler Rep. ¶ 30. That review revealed that 98% of the patients in the sample in fact had at least one previous *treatment* interaction—an appointment, exam, transaction, order, prescription, note, or other indication of a health-care interaction—with MyEyeDr. that Murtoff's proposed automated search would not reflect. *Id.* ¶ 70. Breaking that down further, around 54% of the sampled patients were from acquired practices and had previous treatment interactions that did not show up in MyEyeDr.'s database; around 26% had interactions that were hidden in duplicate patient profiles; and around 12% had notes fields that need to be manually reviewed to determine if they had interactions. Def.'s Resp. Class Cert. at 9–11; R. 103-4, Sponsler Decl., Exh. 2.. None of these details would be reflected through automated searches like the one that Murtoff has

proposed to determine the class members, specifically, the last part of the proposed class definition (namely, whose Acuity "patient profile" within MyEyeDr.'s records reflects no appointments, orders, or transactions).

Remember that whether an individual had an established treatment relationship with MyEyeDr. is a crucial factor in whether reminder calls to that person qualify for the Health Care Rule. And if the Rule's exemption applies, then MyEyeDr. is not liable under the TCPA for those calls. Thus, the Sponsler Report reveals that for each proposed class member, determining whether MyEyeDr. violated the TCPA would require individualized, manual review of that person's healthcare records to identify the extent of his treatment interactions with MyEyeDr.

Murtoff does not adequately rebut this evidence. For one thing, she does not provide a competing manual-review report to counter the Sponsler Report's findings. Nor does she attempt to rebut the Sponsler Report head on. Instead, she tries to navigate around it, asserting that Sponsler's findings of health-care interactions in pre-acquisition patient records are irrelevant because treatment relationships that existed between an *optometry practice* and a patient before MyEyeDr. acquired that practice do not count as relationships between *MyEyeDr.* and the patient. Pl.'s Class Cert. Reply at 1. To support that contention, she points to an expert report by Dr. Griffin Trotter. *See* R. 112-2, Exh. F, Trotter Rep. But this argument and report come too late. Rather than introducing them in her class-certification motion, Murtoff raises the contention for the first time in her reply brief. *See* Pl.'s Class Cert. Reply at 1–2. So reliance on the report is forfeited. *Narducci v. Moore*, 572 F.3d 313, 324

17

(7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited.").

Importantly, even if Murtoff had properly raised this argument, it would still fail. In his report, Trotter states that "when [a] clinician terminates the old … practice for new corporate arrangements, the established patient-clinician relationship ends unless the patient indicates otherwise …." Trotter Rep. ¶ 23. But Trotter offers no support, sources, or principles for arriving at this conclusion. *See id.* And it makes little sense given the factual record. When MyEyeDr. acquires optometry practices, the seller-optometrists almost always stay with the practice and continue seeing their patients just as before. R. 102-2, Exh. A, Olney Decl. ¶¶ 5–7. Given that arrangement, it would be counterintuitive to say that the optometrists' treatment relationships with their patients terminate just because the practice's corporate structure has changed. Likewise, it would make little sense to say that MyEyeDr. has no treatment relationship at all with patients who have come under its umbrella through practice acquisitions. The Trotter Report is unreliable and unpersuasive.

Murtoff's other responses also do not support class certification. She says that issues with duplicate patient profiles can be resolved by searching the database by patient name and date of birth instead of by PatientID number. Pl.'s Class Cert. Reply at 7–8. But that would not solve the problem. In many cases, MyEyeDr. staff found duplicate patient profiles and merged them into a new PatientID. R. 112-4, Exh. H, Sponsler Dep. at 110:1–111:25. During this merge process, the company's staff would move the name and date of birth information from the old duplicate

profiles into the new one—but they would leave *behind* patient-interaction information in the duplicates. *Id*. at 111:13–25. So the new merged patient profile would contain the patient's identifying information but would not contain all of his previous interactions with MyEyeDr. *Id*. Thus, manually tracking down and reviewing the duplicate profiles would still be needed to get all of the details of the treatment relationship between the patient and MyEyeDr.

Finally, Murtoff argues that any information in the notes fields of patient profiles is redundant. Pl.'s Class Cert. Reply at 8. But that is not the case. The notes fields are not searchable, and their content is also often not transferred when MyEyeDr. merges duplicate patient profiles. Sponsler Rep. ¶ 47. And these "notes may contain [i]nteraction [i]ndicators that are not discoverable by searching for … profiles that do not reflect appointments or transactions." *Id*. So again, manual review of patient profiles is required to capture all of the previous interactions discussed in these notes.

In sum, the Court agrees with MyEyeDr. that individual, manual review would be required to determine the extent of previous interactions that each proposed class member had with MyEyeDr. before receiving eye-exam reminder calls. That is a problem for both the whole Class and the Outside Doctor Subclass because whether or not a patient had a prescription from an outside doctor, manual review of his records would be needed to see if the patient had treatment interactions with MyEyeDr. As discussed next, the need for manual review undermines class certification.

## C. Predominance is Not Satisfied

MyEyeDr. argues that common questions do not predominate here because an individual inquiry into each proposed class member's pre-call treatment interactions with MyEyeDr. would be needed to determine TCPA liability. *See* Def.'s Resp. Class Cert. at 14–18. That is correct, and it is fatal to class certification.

Under Rule 23(b)(3), the plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). That predominance requirement is satisfied when "common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 815 (7th Cir. 2012) (cleaned up). So the Court must compare the role of common issues of law and fact with the role of individual issues. *Id.* When liability would have to be determined "on a case-by-case basis" for each class member, predominance is not satisfied, "preclud[ing] certification under Rule 23(b)(3)." *Howland v. First Am. Title Ins. Co.*, 672 F.3d 525, 532 (7th Cir. 2012). That is precisely the case here.

As the Sponsler Report shows, automated database searches cannot be used to determine the full extent of any individual class member's treatment interactions with MyEyeDr. That means that manual, individual record review would be required to decide whether calls to that class member fall within the Health Care Rule, exempting MyEyeDr. from TCPA liability. And again, that is true for both the broader Class and the Outside Doctor Subclass. Thus, liability would be a case-by-case

determination here, undermining predominance. To be sure, there are common questions of law and fact among the proposed class members—for example, whether MyEyeDr.'s reminder calls contained a prerecorded message and whether its actions were knowing and willful. But those common questions are outweighed by the need to individually determine the applicability of the Health Care Rule to each class member. And because predominance is required for certification under Rule 23(b)(3), that alone is enough to deny Murtoff's motion.

Typicality is also not met here, cementing that certification is not proper. Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (cleaned up). So if Murtoff's "claim involves facts that distinguish her claim from the claims of her fellow class members," that "undermine[s] the typicality that … Rule [23(a)(3)] demands." *Muro v. Target*, 580 F.3d 485, 492 (7th Cir. 2009). Under that standard, Murtoff's claims are not typical of the classes she seeks to certify.

Murtoff's interactions with MyEyeDr. before she started getting reminder calls were quite limited. She asked for a price quote on glasses, sent some information over by email, and then spoke to a staff member over the phone to have her questions about the glasses answered. But much of the proposed class had far more contact with MyEyeDr. before getting calls. Specifically, a significant portion of the proposed class

21

has had one or more treatment interactions with an optometrist whose practice was acquired by MyEyeDr. (based on Sponsler's sampling, this is more than 50% of the proposed class). Def.'s Resp. Class Cert. at 9; *see* Sponsler Decl., Exh. 2. Even within the Outside Doctor Subclass, many class members may have had more interactions with MyEyeDr. than Muroff did. Though their records reflect a prescription from a non-MyEyeDr. optometrist, these class members, unlike Murtoff, may have still seen or interacted with a MyEyeDr. optometrist before they started getting reminder calls. These factual distinctions matter because again, calls to this chunk of the proposed class and subclass might qualify for the Health Care Rule, arguably removing the TCPA's prior express written consent requirement. So these class members' claims would turn not on whether MyEyeDr. got written consent to call them, but rather on whether they gave consent at all. Because Murtoff's claims are thus distinguishable from those of a large portion of the class and subclass, she fails the typicality requirement.

Murtoff's inability to satisfy predominance and typicality mean that the proposed class and subclass cannot be certified. Though she may have met some of the other Rule 23 requirements, failure to meet even one requirement is enough to doom certification. Here, she fails two. The Court thus denies the motion for class certification.

## IV. Conclusion

MyEyeDr.'s motion for partial summary judgment and Murtoff's motion for class certification are both denied. Murtoff's individual claim may proceed. The

parties shall engage in settlement negotiations and file a status report on or before October 23, 2024, on a proposed next step of the litigation.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 24, 2024